**IN THE UNITED STATES DISTRICT COURT**
**OF THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **KEITH MANUFACTURING CO.** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Case No. 5:15-cv-9-CMC** |
| | § | |
| **CARGO FLOOR B.V. AND** | § | |
| **MAGNIDRIVE BV** | § | |
| *Defendants* | § | |
| | | |
| **MAGNIDRIVE BV AND CARGO** | § | |
| **FLOOR B.V.** | § | |
| *Counterclaim Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KEITH MANUFACTURING CO.** | § | |
| *Counterclaim Defendant.* | § | |

## ORDER

Before the Court are the following pending motions:

**Cargo Floor B.V. and MagniDrive B.V.'s Motion to Dismiss for Lack of
Standing (Docket Entry # 182); and**

**Cargo Floor B.V. and MagniDrive B.V.'s Motion for Sanctions (Docket Entry
# 184).**

The Court, having reviewed the relevant briefing and hearing arguments of counsel

October 10, 2017, is of the opinion the motion to dismiss for lack of standing should be

**GRANTED.** Cargo Floor B.V. and MagniDrive B.V.'s Motion for Sanctions (Docket Entry # 184)

is **GRANTED** in part and **DENIED WITHOUT PREJUDICE** in part as outlined herein. The

1

Court grants the part of Cargo Floor's motion for sanctions seeking the deposition of Mark Foster, but reserves for a later determination the issues of whether Keith Manufacturing Company's claims relative to the three disputed patents should be dismissed with prejudice and whether Cargo Floor should recover its costs in defending Keith Manufacturing Company's claims regarding the disputed patents.

## I.   BACKGROUND

On January 28, 2015, Keith Manufacturing Company ("KMC") filed its original complaint for trademark infringement under the Lanham Act against Cargo Floor B.V. (Docket Entry # 1). Six months later, KMC filed a First Amended Complaint for Patent and Trademark Infringement ("FAC") against Cargo Floor B.V. and MagniDrive B.V. (collectively "Cargo Floor"), asserting Cargo Floor infringes each of five patents KMC claims to own:

- U.S. Patent No. 6,000,530 ("'530 patent")

- U.S. Patent No. 7,028,832 ("'832 patent")

- U.S. Patent No. 8,006,828 ("'828 patent")

- U.S. Patent No. 6,019,215 ("'215 patent")

- U.S. Patent No. 5,850,905 ("'905 patent")

(Docket Entry # 9). Almost one year later, on December 17, 2015, KMC filed a Second Amended Complaint for Patent and Trademark Infringement ("SAC"), making the same claims and adding Cargo Floor's customer, German Pellets LLC.[1] (Docket Entry # 30).

On December 16, 2016, Cargo Floor filed its Amended Answer to Second Amended

---

[1] On March 30, 2017, the Court entered an Order of Dismissal, dismissing all claims against German Pellets Louisiana, LLC with prejudice.   (Docket Entry # 88).

Complaint, Affirmative Defenses, Counterclaims and Demand for Trial by Jury, asserting, in addition to the previously-asserted counterclaims, violations of the Sherman Act, 15 U.S.C. §§ 1 *et seq*., the Clayton Act, 15 U.S.C. §§ 14, 15, and 26, and the Texas Free Enterprise and Antitrust Act of 1983, TEX. BUS. & COM. CODE § 15.01 *et seq.* (Docket Entry # 69). According to Cargo Floor, KMC "has systematically blocked competitors from the U.S. market by misappropriating the CARGO FLOOR trademark, asserting meritless trademark claims, pursuing patent claims for products it knows do not infringe and by suing and threatening Cargo Floor consumers for legally purchasing competing reciprocating floors." *Id.* at ¶ 112.

## II. CARGO FLOOR'S MOTION TO DISMISS

According to Cargo Floor's current motion to dismiss for lack of standing, Cargo Floor learned on the eve of trial that KMC never even owned, and has falsely represented in its complaint, that it is the owner of three of the five patents involved in this lawsuit – the '530, '215 and '905 patents (the "disputed patents"). Specifically, in the FAC filed on June 11, 2015, KMC alleged the disputed patents are owned by KMC. (FAC, ¶¶ 59, 65, 67). Cargo Floor asserts the disputed patents actually designate KMC's prior president—the now-deceased R. Keith Foster ("Keith Foster")—as the sole inventor and patentee, which would by inventorship make Keith Foster the owner of the disputed patents if such patents are found valid.

KMC has represented the disputed patents were properly transferred by assignment to KMC by act of the executor of Keith Foster's Estate, his son (and now Keith President) Randall Mark Foster ("Mark Foster") on June 9, 2015. However, upon receipt and review of the Estate's probate record, Cargo Floor "learned that the alleged transfer is void ab initio because it took place <u>after</u> the [Oregon] probate proceeding was dismissed and the executor was deprived of his authority to act on behalf of the estate." (Docket Entry # 182 at pgs. 1-2) (emphasis in original).

3

In its response, KMC states public assignment records in the United States Patent and Trademark Office ("USPTO") showed that Keith Foster was the owner, and its attorneys were under "the good faith albeit mistaken belief that there had been a transfer of the patent from Keith Foster prior to his death. Therefore, the assignment from the estate of Keith Foster to Keith Manufacturing seemed appropriate." (Docket Entry # 192 at pgs. 2, 8). According to KMC, it was after Defendants disclosed the potential standing issue to KMC on September 20, 2017 that it investigated the issue and discovered the Foster Estate had been administratively closed on June 27, 2014 allegedly unbeknownst to the attorney drafting the June 9, 2015 assignment to KMC. *Id.* at pgs. 2, 5.

According to KMC, "[u]pon being notified that Defendants were challenging ownership of the three patents, [KMC] applied to the probate court to vacate the administrative closing of Foster's estate to ratify the purported assignment from June 9, [2015]." *Id.* at pg. 5. KMC asserts the Oregon Probate Court vacated the order administratively closing the estate and ratified the actions of the personal representative. KMC states it continued to investigate to trace the ownership of the disputed patents and found certain assignments and licenses which KMC alternatively relies upon to show it had standing with regard to the disputed patents.

### III. CARGO FLOOR'S MOTION FOR SANCTIONS

According to Cargo Floor's separate motion for sanctions, despite KMC's lack of standing to assert three of the five patents in this case, KMC and its counsel have engaged in aggressive litigation tactics which have caused Cargo Floor to incur excessive attorneys' fees, prevented Cargo Floor and its customers from participating in the U.S. market, and wasted precious judicial resources. Cargo Floors requests the Court dismiss KMC's claims relative to the three disputed

patents with prejudice and award Cargo Floor's fees and costs attributable to defending KMC's fraudulent claims.

Additionally, Cargo Floor asserts KMC's decision to assert the disputed patents despite its lack of standing is highly probative of Cargo Floor's sham litigation antitrust claim. According to Cargo Floor, KMC's discovery violations have deprived Cargo Floor of relevant discovery regarding that conduct. Therefore, Cargo Floor also asks the Court to order Mark Foster, as KMC's Rule 30(b)(6) designee, to submit to a deposition in the Texarkana Courthouse under the Court's supervision on topics (to be formulated) related to the following:

> (1) KMC's purported standing to assert the disputed patents, including the chain of title of the disputed patents; and
>
> (2) all documents that are the subject of Cargo Floor's pending Motion for an Order Stripping Keith of Claimed Privileges and In Camera Review of Documents (Docket Entry #109).

(Docket Entry # 184 at pgs. 13-15).

## IV. APPLICABLE LAW

### A.   FED. R. CIV. P. 12(b)(1) standard

The standard for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is whether "it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief." *Benton v. U.S.*, 960 F.2d 19, 21 (5th Cir. 1992). When ruling on a motion to dismiss for lack of standing, the court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by disputed facts that the Court has resolved. *IP Innovation LLC v. Google, Inc.*, 661 F.Supp.2d 659, 662 (E.D. Tex. 2009) (citations omitted). "Parties that hold exclusionary rights and interests in a patent have constitutional standing to sue infringers." *Id.* at 662-63 (citing *Morrow v. Microsoft*,

499 F.3d 1332, 1339 (Fed. Cir. 2007)). The court should only dismiss when it is clear the claimant

can prove no set of facts in support of its claims that would entitle it to relief. *IP Innovation*, 661

F. Supp. 2d at 662-63.

### B.    Standing

Standing to sue is a threshold requirement in every federal case.    *Warth v. Seldin*, 422 U.S.

490, 498 (1975). "A party's standing to sue for patent infringement derives from the Patent Act,

which provides that '[a] *patentee* shall have remedy by civil action for infringement of his patent.'"

*Enovys LLC v. Nextel Commc'ns, Inc.,* 614 F.3d 1333, 1341 (Fed.Cir.2010) (emphasis in original)

(quoting 35 U.S.C. § 281). "A 'patentee' includes 'not only the patentee to whom the patent was

issued but also the successors in title [assignees] to the patentee.'" *Intellectual Prop. Dev., Inc. v.*

*TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1346 (Fed.Cir.2001) (alteration in original) (quoting

35 U.S.C. § 100(d)); *see also Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* 434 F. 3d 1336, 1340

(Fed. Cir. 2006).

"A patent grant bestows the legal right to exclude others from making, using, selling, or

offering to sell the patented invention in the United States."   *Morrow*, 499 F.3d at 1339 (citing 35

U.S.C. § 154 and § 271).   A constitutional injury occurs when a party performs an action that

violates the rights to exclude created by the patent statutes.   *Id.*   Accordingly, to demonstrate

constitutional standing, the plaintiff "must have the right to exclude others from making, using, or

selling the invention in the United States."   *Id.* at 1343.   A party that lacks exclusionary rights

under the patent statute lacks constitutional standing.   *Id.* at 1340-41.

In patent infringement suits, a plaintiff must satisfy the requirements for both constitutional

standing and prudential standing. *See Morrow*, 499 F.3d at 1338–40. Constitutional standing

derives from a plaintiff's proprietary, and exclusionary, interest in a patent because through this

interest the party may suffer a cognizable injury under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In contrast, prudential standing concerns which parties must participate in litigation. *See Intellectual Prop.*, 248 F.3d at 1348.

"A patent owner may transfer all substantial rights in the patents-in-suit, in which case the transfer is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the licensee." *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F. 3d 1354, 1358-59 (Fed. Cir.2010). "When there is an exclusive license agreement, as opposed to a nonexclusive license agreement, but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation. *Id.* at 1360. Finally, a "bare licensee" – one who enjoys only a nonexclusive license – has no standing to sue for infringement under the Patent Act.   *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir.2000).

## V. THE PARTIES' ASSERTIONS AND EVIDENCE

### A.    Cargo Floor's assertions and evidence

Keith Foster died on April 15, 2006. Def. Ex. A, CFM011499. On September 28, 2006, Keith Foster's son, Mark Foster, filed in the Circuit Court of the State of Oregon for the County of Jefferson ("Oregon Probate Court") a Petition for Probate of Will and Appointment of Personal Representative In the Matter of the Estate of R. Keith Foster. *Id.* at CFM011499-502.

Mr. Foster's Will provided for a specific bequest of tangible personal property to Keith Foster's wife, Rose. *Id.* at CFM011504. The remainder of his estate was devised to the R. Keith Foster Trust. *Id*. The last Annual Accounting of Keith Foster's Estate, prepared by Gordon Stewart (also counsel of record in this action) and signed by Mark Foster, in 2012 stated as follows: "The

estate has no assets." *Id.* at CFM011478. The account indicates the Estate needed to remain open to allow transfers and execution of documents on behalf of the decedent related to Patent and Trademark matters. *Id.* at CFM011479.

According to the Annual Accounting for the years 2009-2011, the Estate received no assets and made no disbursements. *Id.* In the Second Annual Accounting and Third Annual Accounting statements, Mark Foster stated the Estate had no money or property. *Id.* at CFM011481-484. The original Inventory statement dated June 15, 2007 states the "complete inventory at this time consists of certain unresolved patent matters, the exact value of which are presently unknown." *Id.* at 11486. The original Inventory never states the Estate owned patents. According to Cargo Floor, at most, the Inventory suggests Keith Foster was involved in patent litigation of a value that was and remains unknown.

Cargo Floor asserts from 2006 to present there is no record of any fee, income, or payment by KMC for its right to use the intellectual property of the deceased, much less payment to heirs or any trust beneficiaries for KMC's use of any intellectual property. Def. Ex. A.

On March 4, 2014, Gordon Stewart was mailed Notice from the Oregon Probate Court that the Estate proceeding would be dismissed unless good cause was shown. *Id.* at CFM011511. On June 27, 2014, the Oregon Probate Court dismissed the matter without prejudice. *Id.* at CFM011477.

Nearly one year after the matter was dismissed and closed, and two days prior to asserting the five patents-in-suit in this case, Mark Foster executed an Assignment of Patents ("the Assignment") purporting to transfer the three disputed patents from the Estate of R. Keith Foster to KMC. Def. Ex. B. Prior to executing the Assignment, Mark Foster repeatedly represented to the Oregon Probate Court that the Estate had no assets. Def. Ex. A at CFM011478 & CFM011481-84.

According to Cargo Floor, Mark Foster's attorney, Gordon Stewart, knew the Estate was closed and that the executor had no authority to act on the Estate's behalf. *Id.* at CFM011511 & CFM011477. Thus, according to Cargo Floor, Mark Foster executed the assignment as the executor and personal representative of the Estate, even though no Estate existed. Def. Ex. B.

On the same day, Bruce Kaser filed the Assignment with the USPTO. Def. Ex. B at pg. 2. By filing with the USPTO, Kaser, Mark Foster, and KMC represented the Estate of Keith Foster owned the disputed patents at the time of the transfer and that Mark Foster was authorized to transfer the patents to KMC. The Assignment indicates that good and valuable consideration was paid. Def. Ex. B. However, according to Cargo Floor, there is no record of any payment ever being made to the Estate. Def. Ex. A.

On September 19, 2017, counsel for Cargo Floor advised KMC's counsel the 2015 Assignment was not valid. On September 21, 2017, Mark Foster filed in the Oregon Probate Court a Motion to Vacate General Judgment of Dismissal for Want of Prosecution and Continue Case as Pending Case, moving "the court for an order vacating the General Judgment of Dismissal for Want of Prosecution nunc pro tunc from the date of dismissal, June 27, 2014, and continuing the case as an active case until further order of [the] court." Def. Ex. A at C2-C3. According to Mark Foster's declaration filed in support of the motion, the "biggest problem and issue involved with the completion of [his] Personal Representative duties has been that [his] Father and his company had numerous foreign and domestic patents and trademark which were in three different entities including his personal name." *Id.* at C4, ¶ C. Mark Foster stated he had executed assignments of patents including assignments since the Estate proceeding was dismissed in his capacities as the Personal Representative and Manager of Keith Investments. *Id.* at C4-C5, ¶ D. Mark Foster further stated as follows:

9

> A lot of the confusion occurred as the result of the death of the Companies' and my Father's longtime Patent Attorney in 2009. Due to the large number of patent and trademarks and the procedure set up to assign them I inadvertently and mistakenly assumed I was still the personal representative. If I had known the Estate was no longer open I would have immediately made arrangements to move the court to set aside the general judgment of dismissal.

*Id*. at C5, ¶ E.   Mark Foster stated he had protected the interests of all beneficiaries of the Estate.

*Id*. at C5, ¶ F.

Paul F. Sumner, attorney for Mark Foster, also filed a declaration in support of the motion. *Id.* at C6-C8. According to Mr. Sumner, the "Personal Representative had been completing his actions in the [E]state which was taking an extremely long time due to patent and trademark issues of his Father, the decedent, in the United States and Internationally," and the "Personal Representative did not complete all of his duties in the Estate." *Id.* at C7, ¶¶ C, D.   Mr. Sumner states Mark Foster was unaware the Estate was no longer active as he continued to work with his second Patent attorney to assign patents and/or trademarks from the Estate or other entities. *Id.* at C7, ¶ D. According to Mr. Sumner, Mark Foster "and Counsel subsequently learned that additional patents owned by the decedent were not transferred to the family corporation prior to the time of the administrative dismissal," and Mark Foster desired "to have any actions he ha[d] taken to be ratified by the Nunc Pro Tunc setting aside of the General Judgment of Dismissal in the interests of equity and to protect the beneficiaries." *Id.* at C7, ¶¶ E, F.

Less than one hour after the motion was filed, the Oregon Probate Court vacated the order of dismissal. *Id*. at C9-10. Specifically, the September 21, 2017 order provides as follows: "General Judgment of Dismissal for Want of Prosecution entered in this matter on June 27, 2014, is vacated *nunc pro tunc* to June 27, 2014, allowing the ratification of any acts of the Personal Representative

undertaken as the Personal Representative of the Estate since that time and this case shall continue as a pending case until further order or judgment of this court." *Id*.

According to Cargo Floor, there is no indication the Oregon Probate Court held a hearing; provided notice to heirs or Trust beneficiaries; determined Mark Foster was acting in the best interest of the Estate, the heirs, or the beneficiaries; or made inquiry into whether Mr. Foster was even authorized to transfer Estate property to himself or KMC.

## B.    KMC's assertions and evidence

KMC takes its name from its founder, R. Keith Foster, the inventor of the disputed patents. According to a July 1999 license attached as Ex. A to the Declaration of Martin MacDonald ("MacDonald Decl."),[2] Keith Foster entered into a non-exclusive licensing agreement with his company, Keith Manufacturing Company, wherein KMC paid Keith Foster 6.5% of company revenue as a royalty ("the 1999 non-exclusive license"). (MacDonald Decl., ¶ 3). The 1999 non-exclusive license did not specifically list the licensed patents by patent or patent application number, other than to state Keith Foster was the owner of "various United States Letters Patents," and KMC was granted a non-exclusive, worldwide license to "said patents," except "in railroad cars." (MacDonald Decl., Ex. A at KMC0000120806, ¶ 1).

According to KMC, all three of the disputed patents had been applied for or issued by the time of the 1999 non-exclusive license and were presumably part of the 1999 non-exclusive license. The 1999 non-exclusive license was not recorded in the USPTO as there is no recordation

---

2 Mr. MacDonald is a Certified Public Accountant who lives in Eugene, Oregon.  MacDonald Decl., ¶ 1.  According to Mr. MacDonald, he and his firm have been outside accountants for Keith Foster for many years, including companies, subsidiaries, and various family trusts he created or founded.  *Id*. at ¶ 2.

requirement for patent conveyances to be effective. Therefore, public assignment records in the USPTO continued to show Keith Foster was the owner.

According to Mr. MacDonald, his firm prepared income tax returns for Keith Foster for 1999 and 2000 on which the firm reported patent royalties received from KMC under the 1999 non-exclusive license agreement. (MacDonald Decl., ¶ 5).   At the end of 2000, the Portland Office of Davis Wright Tremaine provided Mr. MacDonald and his firm "copies of organizational documents for Keith Investments, LLC (an Oregon Limited Liability Company)" ("Keith Investments"). *Id*. at ¶ 6. According to KMC, Keith Investments was created as a holding company, for estate planning purposes, to enable Keith Foster to transfer his assets to other family members.

At the same time Mr. MacDonald and his firm were provided the organizational documents for Keith Investments, they were "presented with a copy of an assignment of [Keith] Foster's shares of ownership of Keith Manufacturing Company, which assignment represented the majority of the outstanding shares of Keith Manufacturing Company," as well as a December 29, 2000 assignment of Keith Foster's patent rights to Keith Investments ("the 2000 Patent Assignment"). (MacDonald Decl., ¶ 7).

The 2000 Patent Assignment is attached as Ex. C to the MacDonald Declaration. The assignment caused Keith Investments to acquire "FOSTER'S entire right, title and interest in and to" the three disputed patents as part of a larger patent portfolio. The 2000 Patent Assignment was not recorded in the USPTO, and the USPTO continued to show Keith Foster as the owner of the patents.

According to KMC, the 2000 Patent Assignment "also put Keith Investments in Mr. Foster's position as a licensor vis-à-vis the earlier 1999 non-exclusive license to Keith Manufacturing Co." (Docket Entry # 192 at pg. 3). As a consequence, the royalties paid to Keith

Foster by KMC under the 1999 non-exclusive license were thereafter transferred and paid from KMC directly to Keith Investments. According to Mr. MacDonald, Keith Foster reported to him and his firm that after the 2000 assignment of patent rights, KMC continued to pay the 6.5% royalty owed under the 1999 non-exclusive license to Keith Investments. (MacDonald Dec. ¶ 8). Thus, the receipt of royalties from KMC was reported on the Keith Investments' income tax return rather than on Keith Foster's individual income tax return.   *Id.*

Attached as Ex. D to the MacDonald Declaration is a separate December 29, 2000 Royalty and License Agreement between Keith Investments and K.B. & B. Construction and Engineering, Inc. ("the 2000 KB&B License Agreement"). According to KMC, Keith Foster had previously created a separate entity called K. B. & B. Construction and Engineering, Inc. doing business as Keith's Bins & Bunkers, Inc. ("KB&B") "for the purpose of construction of buildings and the manufacture and sale of bunker systems and railcar systems, which was why the 1999 non-exclusive license to Keith Manufacturing Co. included an exception for railcars."   (Docket Entry # 192 at pg. 4). The 2000 KB&B License Agreement is a non-exclusive, worldwide license to make, use and sell devices covered by specific patents, including the three disputed patents.[3]

According to Mr. MacDonald, he and his firm were presented with information showing that Keith Investments received royalties from KB&B under the 2000 KB&B License Agreement from 2000 through 2005. (MacDonald Decl., ¶ 9). "As advised by [Keith] Foster, [MacDonald and his firm] reported on the KB&B compilation report, footnote 6, that this agreement expired on December 31, 2005."   *Id.*

_____

3  According to KMC, the KB&B license was not recorded in the USPTO.

Therefore, as of the end of the year 2000, Keith Investments stood in the position of the owner of Keith Foster's patents and was the licensor in two separate patent licenses: (1) the 1999 non-exclusive license to KMC and (2) the 2000 non-exclusive license to KB&B. KMC asserts the KB&B license had an initial five-year term and was deemed "expired" by the company and "recorded in KB&B company records that way, as of December 31, 2005, leaving a non-exclusive license to Keith Manufacturing Co. at that time."[4]  (Docket Entry # 192 at pg. 4).

According to Mr. MacDonald, during his firm's engagement to compile financial statements for KMC and Keith's Bins and Bunkers, Inc., he and his firm were presented with a revised exclusive royalty and license agreement with an effective date of January 1, 2006. (MacDonald Decl., ¶ 10). The firm reported the receipt of royalties from KMC under the revised royalty and license agreement on the compiled financial statements of KMC and KB&B and the income tax return for Keith Investments for the years affected by the revised agreement.  *Id.*   The 2006 agreement altered patent-related payments from 6.5% of revenue to quarterly lump sum payments, and the revised payments were reflected on the books and records presented to Mr. MacDonald and his firm during their compilation and tax return engagement.  *Id.* at ¶ 11.

A copy of the January 1, 2006 Royalty and License Agreement between Keith Investments as Licensor and KMC as Licensee ("the 2006 License Agreement") is attached as Ex. E to the MacDonald Declaration. In the 2006 License Agreement, Keith Investments and KMC terminated all previous licenses to Keith Foster's patents, and KMC was granted an "exclusive, worldwide license to make, use and sell the devices covered by the existing patent[s]." (MacDonald Decl., Ex. E at KMC0000120799, ¶ 1). According to KMC, the 2006 License Agreement gave KMC all

---

4 As will be discussed in more detail later, Cargo Floor disputes the assertion that the 2000 KB&B License Agreement expired, noting the agreement requires written notice.

14

substantial rights to Keith Foster's patents at that time, leaving none for Keith Investments to assign or license to others. *See also* KMC's Financial Statements previously disclosed to Defendants (attached as Ex. F to MacDonald Decl. ¶ 13).

According to KMC, Keith Foster passed away shortly thereafter. Although the 2006 License Agreement was identified in annual company financials that were disclosed to Defendants during discovery in this case, the 2006 License Agreement itself was not disclosed until this issue arose. KMC explains that Keith Foster and his long-time patent lawyer are dead, making its recent investigation difficult. According to KMC, it was only after checking with Keith Foster's accountant, Martin MacDonald, about the notes in the financial statements and another law firm's role in forming Keith Investments that KMC was able to ascertain the chain of events and locate the assignments and licenses discussed above. KMC contends it has standing to sue Cargo Floor on the three disputed patents by virtue of the assignment from the Estate of Keith Foster to KMC and alternatively upon these licenses outlined above.

## VI. WHETHER THE ASSIGNMENT IN OREGON
## PROBATE COURT CONFERRED STANDING

KMC's SAC alleges KMC owns the disputed patents. According to Cargo Floor, KMC premised this claim on a 2015 assignment of rights that purportedly occurred more than one year after Keith Foster's Estate was closed. Cargo Floor points out standing must be present at the time the suit is brought and asserts *nunc pro tunc* assignments are not sufficient to confer retroactive standing.  Cargo Floor asserts KMC recently made false representations to obtain an order in Oregon that reopened the Estate and purports to ratify the false 2015 Assignment.

In its surreply, KMC asserts Cargo Floor does not dispute the objective evidence that the USPTO office records showed Keith Foster personally owned the disputed patents at the time of

15

assignment of the disputed patents from the Estate to Keith. According to KMC, Cargo Floor

attacks "the [2015 Assignment] from the standpoint of whether it was valid to make the assignment

at the time it was made, given the administratively closed status of Mr. Keith Foster's estate."

(Docket Entry # 196 at pg. 2). KMC contends this issue was resolved by Judge Ahern's order

vacating the administrative closure and ratifying the assignment. The Court disagrees.

> KMC's argument in this regard is as follows:

> Under Oregon law Judge Ahern's order made the assignment valid at the time it
> was made. *See also* ORS 114.255 (A personal representative may ratify and accept
> acts on behalf of the estate done by others where those acts would have been proper
> for a personal representative). *Rennie v. Pozzi*, 294 Or. 334, 339–40, 656 P.2d 934,
> 938 (1982) (Oregon follows the relation back doctrine).

*Id.*

> ORS 114.255, relied upon by KMC, was enacted as part of a major revision of Oregon's

probate code and provides as follows:

> The duties and powers of a personal representative commence upon the issuance of
> his letters. The powers of a personal representative relate back in time to give his
> acts occurring prior to appointment the same effect as those occurring thereafter. A
> personal representative may ratify and accept acts on behalf of the estate done by
> others where those acts would have been proper for a personal representative.

*Rennie v. Pozzi*, 294 Or. 334, 339–40, 656 P.2d 934, 938 (1982). "The evident purpose of the

statute . . . is to facilitate and legitimate beneficial acts done on behalf of the estate which by their

nature are necessary or expedient to do in the interim between the decedent's death and the

appointment of a personal representative."  *Id*. at 340.

> In *Rennie*, also relied upon by KMC for the proposition that Oregon follows the relation

back doctrine, the "plaintiff had in good faith obtained a facially valid court order reopening the

estate and appointing him personal representative; he instituted [certain] actions in reasonable

reliance upon the order and with the consent of the estate's beneficiary (*i.e.,* not as an officious

16

intermeddler)." *Id*. at 342. According to the Supreme Court of Oregon, "the actions [were] potentially beneficial to the estate; the defect invalidating the original order was technical and procedural rather than substantive; there ha[d] been no change in the substantive causes of action alleged; and the new personal representative ratified the acts done on behalf of the estate by the former (*viz.,* the commencement of these actions)." *Id*. Thus, the court held the "policies behind the statutes of limitations would not necessarily be served by mandating dismissal." *Id*. at 342-43.

> According to the court,
>
> In the context of decedents' estates, the usual rationale for the relation back of a personal representative's powers is to enable someone to act on behalf of the estate pending appointment. The subsequent appointment 'relates back' in the sense that for all legal purposes the prior act done by the personal representative-to-be on behalf of the estate is deemed to have done by him or her at that time as personal representative with all the normally attendant powers. Typically, relation back is desired so that those things 'necessary or expedient' can be taken care of without the relevant parties having to wait for final appointment. It also has importance, however, where an action is commenced on behalf of an estate and the relevant statute.

*Id*. at 341. Applying this rule to the facts of the *Rennie* case, the court held the plaintiff's "appointment as personal representative, albeit after the running of the statute of limitations, related back in time to the commencement of these actions making them valid and timely." *Id.* at 343.

This situation is not like the one presented in *Rennie*, wherein by operation of ORS 114.255, the plaintiff's appointment as personal representative related back to the commencement of the action making it valid and timely.   As a general matter, parties should possess rights before seeking to have them vindicated in court. *Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F.Supp. 305 (D.Del. 1995). Cargo Floor correctly focuses on Federal Circuit cases regarding

*nunc pro tunc* assignments, asserting such assignments are not sufficient to confer retroactive standing.   According to the Federal Circuit:

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignment in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093–94 (Fed. Cir. 1998).

KMC has not provided the Court any reason to stray from this sound reasoning to confer standing based on an assignment made while the Estate was closed, notwithstanding the language of the Oregon Probate Court's order. Reopening the Oregon case is one thing, but the order also purports to allow ratification of the personal representative act of Mark Foster even when the Estate was closed. Even assuming this "ratification" is proper, the Court is not convinced the Oregon Probate Court's September 21, 2017 order, entered over two-and-a-half years after this action was instituted, can retroactively solve the standing problem that existed at the time of the filing of the patent infringement claims in June of 2015. *See Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779 (Fed. Cir. 1996) (explaining that *nunc pro tunc* assignment was not effective to retroactively confer standing; even though it was drafted to be effective prior to suit, it was executed after suit was filed); *see also Schreiber Foods, Inc. v. Beatrice Cheese, Inc.,* 402 F.3d 1198, 1203 (Fed.Cir. 2005) ("[I]f the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured.").

The Court now considers whether the 2006 License Agreement, produced for the first time

18

with the response brief, provides KMC with standing to sue for infringement of the disputed patents.

## VII. WHETHER THE 2006 LICENSE AGREEMENT CONFERRED STANDING

### A.      Applicable law

The right to sue infringers is normally the privilege of the person that has the legal title to the patent.  *See United States v. General Elec. Co*., 272 U.S. 476, 489 (1926).   However, where a patentee transfers all substantial rights under the patent, the transferee will be deemed the effective patentee under the statute and has standing to bring suit in its own name. *See Ortho Pharm. Corp. v. Genetics Inst. Inc*., 52 F.3d 1026, 1030 (Fed. Cir. 1995).

A transfer of "title" to a patent – also called an assignment – is governed by 35 U.S.C. § 261. *Prima Tek II,* 222 F.3d at 1377. Section 261 recognizes, and courts have long held, that an exclusive, territorial license is equivalent to an assignment and may therefore confer standing upon the licensee to sue for patent infringement. *Id.* An exclusive licensee has standing because "[a] party. . . that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention" and therefore has constitutional standing. *Intellectual Prop.,* 248 F.3d at 1346–47.

In *Morrow*, the Federal Circuit explained that if a plaintiff suing for patent infringement has an exclusive license *and* "all substantial rights," then it has both (1) constitutional standing because it suffers injury-in-fact; and (2) prudential standing because it has "all substantial rights." *See* 499 F.3d 1332, 1340 (Fed. Cir. 2007). However, if the Court finds that the plaintiff holds only some exclusionary rights and interests, but not all substantial rights to the patent, then the party is deemed to have constitutional standing but not prudential standing. *See id.*

Accordingly, in these instances, the patentee who transferred the exclusionary interests must usually be joined to satisfy prudential standing concerns. *See id.* (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 467, 469 (1926)). "The patentee is joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer." *See Morrow*, 499 F.3d at 1340 (citing *Intellectual Prop.*, 248 F.3d at 1347 (indicating that joining the patentee satisfies a prudential not constitutional standing requirement). The Federal Circuit explains as follows:

> Either the licensor did not transfer 'all substantial rights' to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer 'all substantial rights' to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own.

*Alfred E. Mann*, 604 F.3d at 1359–60.

In contrast, nonexclusive licensees, or bare licensees, lack standing to sue for patent infringement and cannot cure their lack of standing by joining the patent owner as a plaintiff. *Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004) (explaining that because the transferee was not granted the right to enforce the patent, the agreement conveyed no more than a bare license); s*ee also Intellectual Prop.,* 248 F.3d at 1345 ("[A] nonexclusive license or 'bare' license . . . confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or 'bare') licensee suffers no legal injury from infringement."); *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1553–54 (Fed.Cir.1995) ("The grant of a bare license to sell an invention in a specified territory, even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others.").

Bare license holders do not have constitutional standing because they do not have the right to exclude others from using the patent; and, therefore, they cannot be injured by another's use of the patent. *Morrow,* 499 F.3d at 1340–41 (describing why bare license holders lack constitutional standing); *see also WiAV Solutions,* 631 F.3d at 1265 ("[A] so-called 'bare licensee' holds nothing more than a promise from the patentee that the patentee will not sue the licensee for practicing the patented invention."). Holders of bare licenses "do not . . . 'share' with the patentee the property rights represented by the patent so as to have standing to sue as a co-plaintiff with the patentee." *Rite–Hite,* 56 F.3d at 1553. Therefore, "[t]his standing deficiency cannot be cured by adding the patent title owner to the suit." *Morrow,* 499 F.3d at 1341.

The title of the transfer in the agreement does not determine what type of agreement it is; rather a court looks to the kinds of rights that are transferred to determine the licensor and licensee's status. *Intellectual Prop.,* 248 F.3d at 1344 ("The title of the agreement at issue, which uses the term 'license' rather than the term 'assignment,' is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination.").

## B.      Case law regarding assignment by way of license

The Federal Circuit has "never purported to establish a complete list of the rights whose holders must be examined to determine whether a licensor has transferred away sufficient rights to render an exclusive licensee the owner of a patent." *Alfred E. Mann*, 604 F.3d at 1360. However, "the Federal Circuit has compiled a non-exhaustive list of rights for determining whether a licensor has transferred 'all substantial rights' to the licensee." *Luminara Worldwide, LLC v. Liown Electronics Ltd.*, Case No. 14-cv-3103, 2015 WL 11018002, at * 11 (D. Minn. April 20, 2015). The list includes the following factors:

(1)     the nature and scope of the right to bring suit; (2) the exclusive right to make, use, and sell products or services under the patent; (3) the scope of the licensee's right to sublicense; (4) the reversionary rights to the licensor following termination or expiration of the license; (5) the right of the licensor to receive a portion of the proceeds from litigating or licensing the patent; (6) the duration of the license rights; (7) the ability of the licensor to supervise and control the licensee's activities; (8) the obligation of the licensor to continue paying maintenance fees; and (9) any limits on the licensee's right to assign its interests in the patent.

*Id.* (quoting *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1343 (Fed. Cir. 2014)).

Several of the Federal Circuit's earlier decisions indicate that if the patent owner could give licenses to others or encumber a licensee's ability to transfer patent rights, then the license was not an exclusive license. *See My First Shades v. Baby Blanket Suncare*, 914 F. Supp. 2d 339, 347–48 (E.D.N.Y. 2012 (citing *Morrow,* 499 F.3d at 1342 ("[T]he transfer of the right to sue . . . [does] not provide standing to even participate in the suit because the *agreement* did not clearly manifest that the owner would refrain from granting a license to anyone else in the particular area of exclusivity. . . . [T]he right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded." (emphasis in original))); *see also Propat Int'l Corp. v. Rpost, Inc.,* 473 F.3d 1187, 1194 (Fed.Cir.2007) (holding that licensee was not given an exclusive license when it was "not allowed to assign its interests under the agreement without [licensor's] consent, which can be withheld on any ground ... [and] [licensee] must provide [licensor] with notice and obtain [licensor's] consent to its selection of targets for licensing and suit.").

In *Prima Tek II,* the Federal Circuit found that an exclusive licensee did not receive all substantial rights in the patent and thus could not alone sue for infringement. 222 F.3d at 1382. The agreement granted the licensee, Prima Tek I, "the exclusive, worldwide right to make, use, and sell the products and processes covered by the patents, but only to the extent necessary to grant

22

a sublicense to Prima Tek II." *Id*. at 1374. The license automatically terminated at the end of a defined time period unless the licensor notified the licensee of a renewal. *Id*. at 1380. The agreement also provided Prima Tek I, the licensee and sublicensor, with the sole and exclusive right to sue third parties for infringement and to collect damages for infringement, while the licensor, Southpac International, Inc., was bound by any judgment rendered. *Id*. at 1382. However, the court determined that "Prima Tek I's right to exclude was explicitly defined—and then extinguished—by the sublicense in Prima Tek II." *Id*. at 1380. The court found Prima Tek I's rights were limited both before and after the sublicense, and thus held that all substantial rights in the patent were not conveyed. *Id*.

In *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.,* the Federal Circuit held an exclusive licensee did not receive all substantial rights in the patent and thus did not have standing to sue for infringement. 248 F.3d at 1345. In that case, the licensee was granted the rights to make, use, and sell the invention, but the agreement did not transfer the sole right to sue other parties for infringement. *Id*. at 1344. Rather, the agreement provided that where the licensing patentee was a necessary party to the litigation, it must consent to the litigation, and its consent could be withdrawn at any time. *Id*. The agreement further provided that where the licensing patentee was not a necessary party, the licensee was required to consult with the licensor and keep it fully informed. *Id*. Finally, the agreement gave the licensor the right to prevent the licensee from assigning the benefits of the license to a third party. *Id*.

However, according to the *My First Shades* court, recent Federal Circuit decisions have moved away from a focus on the restrictions placed on a licensee in determining whether or not a licensee has an exclusive license and have held that restrictions on the licensee alone are not dispositive. 914 F.Supp.2d at 348. For example, in *Alfred E. Mann,* a 2010 decision, the agreement

at issue had restrictions on the licensee's right to sue and the licensor's retention of the power to sublicense to others. Although the agreement was an exclusive license agreement, the court held it was not a virtual assignment of the patents so the owner of the patents retained standing to sue accused infringers. 604 F.3d at 1363.

In December of 2011, the Federal Court noted the license agreement did not give "any right to enforce the patent against suspected infringers" to the licensee. *Delano Farms Co. v. California Table Grape Com'n,* 655 F.3d 1337, 1342 (Fed.Cir. 2011). The licensor had also retained control over sublicenses. Sublicense agreements were "subject to prior submission to and approval" by the licensor; and the licensor retained the right to dictate that the licensee must issue a sublicense. *Id.* at 1343. Nevertheless, the licensee could still be a party to the litigation, as long as it joined the licensor, because the agreement granted the licensee "exclusive right to, among other things, use, propagate, and sell the patented varieties as well as to grant sublicenses[.]" *Id.* at 1342–43.

With this case law in mind, the Court's considers whether the 2006 License Agreement between Keith Investments and KMC constitutes a transfer of all substantial rights. To complete this inquiry, the Court "'must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted.'" *Luminara*, 2015 WL 11018002, at *10 (quoting *Alfred E. Mann*, 604 F.3d at 1359).

## C.    Discussion

According to KMC, as of the end of 2000, Keith Investments was the owner of Keith Foster's patents and was the licensor in two separate patent licenses: (1) the 1999 non-exclusive license to KMC, and (2) the 2000 non-exclusive license to KB&B. KMC asserts the 2000 KB&B License Agreement had an initial five-year term and was deemed "expired" by the company and "recorded in KB&B company records that way, as of December 31, 2005, leaving a non-exclusive

license to Keith Manufacturing Co. at that time." (Docket Entry # 192 at pg. 4). Cargo Floor disputes the assertion that the 2000 KB&B License Agreement expired, noting the agreement is "automatically renewable unless terminated upon 30 days written notice by either party" of termination. (MacDonald Decl., Ex. D at KMC0000120825, ¶ 8).

KMC has constitutional standing if its interest in the disputed patents includes sufficient exclusionary rights such that it suffers an injury in fact from infringing activities. *See Morrow,* 499 F.3d at 1341. At the time of filing, KMC had entered into a revised royalty and license agreement with an effective date of January 1, 2006. (MacDonald Decl., ¶ 10). In the 2006 License Agreement, Keith Investments and KMC terminated all previous licenses to Keith Foster's patents, and KMC was granted an "exclusive, worldwide license to make, use and sell the devices covered by the existing patent[s]." (MacDonald Decl., Ex. E at KMC0000120799, ¶ 1). According to KMC, the 2006 License Agreement gave KMC all substantial rights to Keith Foster's patents at that time, leaving none for Keith Investments to assign or license to others.

In effect, KMC asserts it is an assignee because it was given an exclusive license in 2006 with all substantial rights to the disputed patents.[5] Cargo Floor asserts Keith Investments did not grant all substantial rights in the disputed patents to KMC with the 2006 license. The Court agrees for the following reasons.

1.      **Right to exclude**

"[T]ransfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment." *Alfred E. Mann,* 604 F.3d at 1360; *see also Prima Tek II,* 222 F.3d at 1379 ("In evaluating whether a particular license agreement transfers all

---

5 KMC is not asserting it was given an exclusive license with less than all substantial rights, thus requiring the patentee to be joined.

substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory.") (emphasis in original). Only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not.

A party who has "received, not only the right to practice the invention within the given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well" is an exclusive licensee, entitled to bring suit for infringement as a co-plaintiff with the patentee. *Rite-Hite Corp.*, 56 F.3d at 1552 (citing *Independent Wireless Telegraph Co. v. Radio Corp. of America,* 269 U.S. 459, 468–69 (1926)). If the party has not received an express or implied promise of exclusivity under the patent, *i.e.,* the right to exclude others from making, using, or selling the patented invention, the party has a "bare license," and has received only the patentee's promise that the party will not be sued for infringement. *Rite-Hite*, 56 F.3d at 1152 (quoting *Western Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118, 5 USPQ 105, 106 (2d Cir.), *cert. denied,* 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930)). A bare license, even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others. *Rite-Hite*, 56 F.3d at 1552-53.

Here, the 2006 License Agreement between Keith Investments and KMC provides as follows:

1. <u>License Granted</u>.   Licensor grants Licensee an exclusive, worldwide license to make, use and sell devices covered by the existing patent and those presently applied for by the Licensor. Licensor hereby grants licensee the right to enter into sublicenses subject to the approval of the Licensor which approval will not be unreasonably withheld.

* * *

7. <u>Transferability</u>.   The license herein granted shall not be assignable or subject to

sublicensing by Licensee.

(MacDonald Decl., Ex. E at KMC0000120799, ¶ 1 & KMC0000120800, ¶ 7). Although the agreement states it is an "exclusive" license, "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman v. Mackenzie,* 138 U.S. 252, 256 (1891). Simply using the language "exclusive license" in the body of the agreement does not equate to a "promise of exclusivity" absent the conveyance of rights amounting to proprietary interests in the patent.

The 2006 License Agreement does not give KMC the right to exclude others (through suit or otherwise) from making, using, or selling devices covered by the disputed patents. Rather, as will be discussed more fully below, it gives KMC the right, but not the obligation, to defend actions against the disputed patents. (MacDonald Decl., Ex. E at KMC0000120799, ¶ 2(c)).

What is more, according to Cargo Floor, there appears to be another license to KB&B, thus KMC's license is not exclusive. The 2000 KB&B License Agreement was disclosed for the first time in KMC's response to Cargo Floor's motion and is a separate Royalty and License Agreement between Keith Investments and K.B.&B. Construction and Engineering, Inc. It is "a non-exclusive, worldwide license to make, use and sell devices covered by" specific patents, including the three disputed patents. (MacDonald Decl., Ex. D at KMC0000120824).

Although KMC contends the 2000 KB&B License Agreement terminated at the end of 2005, KMC has failed to produce a written notice of termination as required by the license agreement. *Id*. at KMC0000120825, ¶ 8 ("Term: this agreement shall be for 5 year terms and automatically renewable unless terminated upon 30 days written notice by either party."). Absent written notice, the license renewed automatically. In that instance, KMC's 2006 license is not an

exclusive one and KMC has no standing at all. *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) ("Put another way, an exclusive license is 'a license to practice the invention . . . accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave.'. . . Thus, if a patentee-licensor is free to grant licenses to others, licensees under that patent are not exclusive licensees.").

**2.      Right to bring suit**

When "the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee." *Alfred E. Mann,* 604 F.3d at 1361. Indeed, "the nature and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent." *Id.*

The Federal Circuit in *Vaupel Textilmaschinen Kg v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870 (Fed.Cir.1991) concluded a patent owner transferred substantial rights to the patent thereby allowing its licensee to bring an infringement action without joining the patent owner. In doing so, the court examined the various agreements that the parties entered. The court scrutinized these agreements in order to distill whether the parties intended to transfer sufficient rights in the patent to allow the licensee to commence a lawsuit in its own name. *Id.* at 874. Importantly, the relevant agreement granted the licensee the "sole right to sue for all infringements, past, present, and future as well." *Id.* at 876. In order to exercise its right to commence litigation, the licensee only had to notify the patentee that it intended to bring a lawsuit. *Id.* at 875. The right to sue for infringement, subject only to the obligation to inform, was "particularly dispositive" of the issue. *Id.* The court reasoned this transferred right was of particular significance because "the policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent

28

the possibility of two suits on the same patent against a single infringer." *Id.* Even though the exclusive license agreement required the licensee to notify the patent owner of its intent to commence an action, the court found this did not impinge on the licensee's right to maintain an infringement action.

Here, the 2006 License Agreement does not provide that KMC can maintain a lawsuit without joining Keith Investments. Paragraph 2(c) of the 2006 License Agreement entered into between the Keith Investments and KMC provides as follows:

> Licensee agrees to defend all patent disputes and to pay all costs including all attorney's fees and costs related to the patents that are the subject of this agreement. If licensee elects not to defend said patents the licensor shall have the right but not the duty to do so at the cost and expense of licensor.

The agreement provides that KMC will defend all patent disputes and pay all costs related to the patents. Keith Investments retained the right to defend itself if KMC elected not to defend the patents. This provision does not grant KMC the exclusive right to sue infringers for past, present and future infringement.

**3.      Right to assign**

"Just as the right to alienate personal property is an essential indicia of ownership, the right to further assign patent rights is implicit in any true assignment." *Sicom Systems, Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 979 (Fed.Cir. 2005) (quoting *Calgon Corp. v. Nalco Chemical Co.*, 726 F.supp. 983, 988 (D.Del. 1989)); *see also Intellectual Prop.,* 248 F.3d at 1345 ("[L]imits on the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all substantial rights.").

The 2006 License Agreement also limits KMC's ability to assign. Paragraph 7 of the 2006 license agreement provides as follows:

> 7. <u>Transferability</u>. The license herein granted shall not be assignable or subject to sublicensing by Licensee.

(MacDonald Decl., Ex. E at KMC0000120800, ¶ 7). Thus, the limit on the assignment of rights is another factor weighing in favor of finding a transfer of fewer than all substantial rights in the disputed patents.

**4.      Right to license**

There is also a question of KMC's right to license. "A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights." *Prima Tek II,* 222 F.3d at 1380; *see also Sicom,* 427 F.3d at 979 (finding licensee lacked "all substantial rights" in part because licensor retained the right to "grant contracts and sub-contracts to develop the [] patent further; offer sublicenses under any improvements or corrections that [licensee] develops; veto any sublicense; and levy additional royalties or other consideration").

Here, one provision of the 2006 License Agreement grants KMC "the right to enter into sublicenses subject to the approval of the Licensor which approval will not be unreasonably withheld," whereas another provision provides the license shall not be "subject to sublicensing" by KMC. (MacDonald Decl., Ex. E at KMC0000120799, ¶ 1 & KMC0000120800, ¶ 7).   Even assuming KMC can grant licenses, Keith Investments retains the right of approval.

**5.      Conclusion**

The Court, having considered the various factors, finds the 2006 License Agreement at issue transferred fewer than all substantial rights in the disputed patents from Keith Investments to KMC. Thus, KMC has no standing under the 2006 License Agreement to sue only in its name. In some instances, courts have permitted defects in prudential standing to be remedied by amendment of a complaint to join a necessary party.   However, not all courts have found such

30

defects remediable by amendment. Significantly, in *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273 (Fed.Cir. 2007), the Federal Circuit reversed the district court's denial of the defendant's motion to dismiss. It held that the motion to dismiss should be granted because the plaintiff, a holder of only an exclusive, field of use license with a geographical limitation, lacked standing to sue on its own. According to the court, joinder of the patent *owner prior to institution of the action* was mandated. *Id*. at 1279. The *Int'l Gamco* court's holding is clear that dismissal is required because the patent owner must be joined in such an action prior to filing suit. *Rd. Sci., L.L.C. v. Cont'l W. Transp. Co.*, No. CIVS09-2023, 2009 WL 4928373, at *5 (E.D. Cal. Dec. 14, 2009); *see also Trendx Enterprises, Inc. v. All-Luminum Prods., Inc*., 856 F.Supp.2d 661, 672 (D.N.J. 2012). As a result, the Court finds Cargo Floor's motion to dismiss should be granted.[6]

Ordinarily the dismissal would be without prejudice. *Intellectual Prop*., 248 F.3d at 1349, n.4. However, in its motion for sanctions pursuant to FED. R. CIV. P. 37 for Keith's false representations and discovery violations related to patent ownership, Cargo Floor seeks, among other things discussed below, dismissal of the disputed patents with prejudice. The Court reserves the issue of whether the dismissal will be with or without prejudice until after limited discovery and supplemental briefing on Defendants' motion for sanctions, which remains pending.

---

6 The Court further notes the 2006 License Agreement may even be properly considered a "bare license." As noted above, a "nonexclusive license confers no constitutional standing on the licensee to bring suit or even join a suit with the patentee because the nonexclusive licensee suffers no legal injury from infringement." *Sicom*, 427 F.3d at 976. Considering the 2000 KB&B License Agreement, and the lack of evidence of written termination of the license agreement, the Court is not convinced KMC holds *exclusionary* rights and interests, despite having some substantial rights to the disputed patents.

## VIII. PARTIAL RULING ON CARGO FLOOR'S MOTION FOR SANCTIONS

In addition to requesting the Court dismiss KMC's claims relative to the three disputed patents with prejudice, Cargo Floor requests the following: (1) award Cargo Floor's fees and costs attributable to defending KMC's fraudulent claims, and (2) order Mark Foster, as KMC's Rule 30(b)(6) designee, to submit to a deposition in the Texarkana Courthouse under the Court's supervision on topics related to KMC's purported standing to assert the disputed patents, including the chain of title of the disputed patents and all documents that are the subject of Cargo Floor's pending Motion for an Order Stripping Keith of Claimed Privileges and In Camera Review of Documents (Docket Entry #109).   (Docket Entry # 184 at pgs. 13-15).

The Court **orders** Mark Foster, as KMC's Rule 30(b)(6) designee, to submit to a deposition in Texarkana under the supervision of Special Master David Folsom on topics related to KMC's knowledge of the 2000 KB&B License Agreement and the 2006 License Agreement only recently produced, despite KMC's false representation to Interrogatory No. 13 directed to license agreements; KMC's decision to assert the disputed patents despite its lack of standing; KMC's lack of knowledge of the lack of standing; and all documents that are the subject of Cargo Floor's pending Motion for an Order Stripping Keith of Claimed Privileges and In Camera Review of Documents (Docket Entry #109).[7]

The Court denies Cargo Floor's request for monetary sanctions at this time. Cargo Floor may re-raise this aspect of the motion following the limited discovery allowed above. However, the Court does order KMC to pay Cargo Floor's fees and costs for re-deposing Mark Foster. The

---

[7] The parties are directed to contact Judge Folsom to schedule the deposition at a mutually convenient time and place. The Court is not requiring the deposition be at the courthouse, but it shall be conducted in Texarkana, Texas.

award of costs, including fees, is not a sanction. It is a default provision of Rule 37 absent one of the exceptions of Rule 37(a)(5)(A). An additional deposition of Mark Foster would have been unnecessary if KMC had discovered and/or produced the 2000 KB&B License Agreement and the 2006 License Agreement. Accordingly, none of the exceptions provided in Rule 37(a)(5)(A)(i)-(iii) apply, and, as a result, KMC must pay Cargo Floor's reasonable expenses incurred in re-deposing Mark Foster, including attorney's fees. KMC is ordered, within fourteen days after receiving Cargo Floor's itemized costs and fees, to either make payment in full or (after meeting and conferring) or object that Cargo Floor's requested fees and costs are unreasonable. Any such objection should be filed as a motion for relief from the Court's order.

## IX. CONCLUSION

Based on the foregoing analysis, it is

**ORDERED** that Cargo Floor B.V. and MagniDrive B.V.'s Motion to Dismiss for Lack of Standing (Docket Entry # 182) is **GRANTED**.    It is further

**ORDERED** that Cargo Floor B.V. and MagniDrive B.V.'s Motion for Sanctions (Docket Entry # 184) is **GRANTED** in part and **DENIED WITHOUT PREJUDICE** in part as outlined herein. Specifically, the Court grants the part of Cargo Floor's motion for sanctions seeking the deposition of Mark Foster, but reserves for a later determination the issues of whether KMC's claims relative to the three disputed patents should be dismissed with prejudice and whether Cargo Floor should recover its costs in defending KMC's claims regarding the disputed patents.

**SIGNED this 27th day of October, 2017.**

CAROLINE M. CRAVEN
33   UNITED STATES MAGISTRATE JUDGE